# United States District Court

**CENTRAL** _____ **DISTRICT OF** _____ **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Three bank accounts

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:**   2:21-MJ-01931

**I, Lyndon Versoza, being duly sworn depose and say:**

I am a Postal Inspector with the U.S. Postal Inspection Service and have reason to believe that in the Central District of California there is now certain property, namely the bank accounts listed in **attachment A**,

**which is (state one or more bases for seizure under United States Code)**

subject to seizure and forfeiture pursuant to 21 U.S.C. §§ 853(f) and 881, 18 U.S.C. §§ 981 and 984, and 28 U.S.C. § 2461(c),

concerning violations of 18 U.S.C §§ 1343, 1344, 1349, and 1956, and 21 U.S.C. §§ 841 and 846.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

(See attached affidavit which is incorporated by reference)

/s *Lyndon Versoza*
**Signature of Affiant**

**Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.**

_____          at ___ Los Angeles, California
**Date and Time Issued**

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
**Name and Title of Judicial Officer**          **Signature of Judicial Officer**

AUSA Andrew Brown (x0102, 11th Floor)

**ATTACHMENT A – Bank Accounts to Seize**

The bank accounts to be seized are:

a.    Wells Fargo Bank account 1907876112, held in the name of Michael POLIAK;

b.    Wells Fargo Bank account 1043037496, held in the name of MGP CONSULTING LLC, to the benefit of Michael POLIAK; and

c.    First Republic Bank account 80009535032, held in the name of "353 S Wetherly Dr. LLC", to the benefit Michael POLIAK and his contractor, Jacob Lavi.

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

### I.  TRAINING AND EXPERIENCE

1.    I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  Currently, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when the services of the United States Postal Service are employed by criminals as part of the means to launder or conceal illicit funds, and/or avoid banking reporting requirements.  I am also one of seven Postal Inspectors in the U.S. currently designated by USPIS as a Subject Matter Expert ("SME") in money laundering investigations.  As a SME, I have spoken at money laundering conferences and provided training to the financial and banking industry and other law enforcement agents. I have also received both formal and informal money laundering training from USPIS and other government and private agencies.  During my 16-year career as a Postal Inspector, I have investigated: mail thieves, burglars, rapists, murderers, armed robbers, prison and street gangs, drug trafficking organizations, and perpetrators of financial violations

- 1 -

(including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters).  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in domestic and international investigations related to crimes involving the exploitation of children and sex trafficking.  In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a U.S. Postal Inspector, I served as a law enforcement officer with the U.S. Immigration and Naturalization Service ("INS"), which later became part of the U.S. Department of Homeland Security.  In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counter-terrorism and smuggling operations.

3.    This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA").  I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law

- 2 -

enforcement personnel and witnesses, including information that
has been reported to me either directly or indirectly.  This
affidavit does not purport to set forth my complete knowledge or
understanding of the facts related to this investigation.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and part only.  All figures, times, and calculations set forth
herein are approximate.

## I. <u>SUMMARY AND PURPOSE OF AFFIDAVIT:   SEIZURE WARRANT FOR BANK ACCOUNTS</u>

4.    This affidavit is made in support of an application
for a warrant to seize the funds held in three bank accounts
(identified specifically below at paragraph 7), all owned,
controlled, or held for the benefit of MICHAEL POLIAK
("POLIAK"), which were used to receive, store, and launder drug
trafficking and bank and wire fraud proceeds, in violation of 18
U.S.C. §§ 1343, 1344, 1349, 1956, and 21 U.S.C. §§ 841 and 846.

### A. <u>Background</u>

5.    U.S. Private Vaults was a business in a strip mall that
rented safety deposit boxes anonymously.  It was owned and managed
by criminals who engage in money laundering, drug trafficking, and
structuring, among other offenses.  Its business model was designed
to appeal to criminals for customers.  It charged many times what
banks do for similar safety deposit box rentals, but staff

conducted countersurveillance for customers, alerted them to law enforcement investigations, and structured transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously. The great majority of USPV customers paid cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it used to pay its operating expenses. By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engaged in money laundering. On March 9, 2021, U.S. Private Vaults, Inc., was indicted by a federal grand jury for Conspiracy to Launder Money, Conspiracy to Distribute Controlled Substances, and Conspiracy to Structure Transactions. A copy of that indictment is attached and incorporated.

6.    MICHAEL POLIAK is a 50 percent owner of USPV. POLIAK bought his share of the business in or around April, 2019 for $500,000. In meetings with CS-1, in great detail, POLIAK discussed how he profited from criminal activity stemming from illegal sale of marijuana, health care fraud and pandemic relief funds. My review of SUBJECT ACCOUNTS 1 and 2 corroborate the statements made to CS-1. POLIAK also described how he laundered money to include how he took illicit proceeds (SUBJECT ACCOUNT 1) to purchase a property on Crownridge Dr in Sherman Oaks ("Crownridge Property.") A review of escrow and financial records corroborated his

statements about the purchase of the Crownridge Property and later the sale of the property.  Records also show that escrow from the sale Crownridge Property closed in or about March, 2021.  I tracked the proceeds from the sale of the Crownridge Property and determined that the tainted proceeds were wire transferred into the SUBJECT ACCOUNT 1 then subsequently moved to the other SUBJECT ACCOUNTS 3, completing the money laundering cycle.  Additionally in violation of promotional money laundering, from my review of the SUBJECT ACCOUNTS 1 and 2, I learned that POLIAK used illicit funds from drug trafficking and health care fraud to purchase U.S. Private Vaults.

B. <u>SUBJECT ACCOUNTS</u>

7.    This affidavit is offered in support of an application for a warrant to seize the funds held in the following bank accounts (hereinafter referred to as the "SUBJECT ACCOUNTS"):

a.    SUBJECT ACCOUNT 1:  Wells Fargo Bank account 1907876112, held in the name of Michael POLIAK;

b.    SUBJECT ACCOUNT 2: Wells Fargo Bank account 1043037496, held in the name of MGP CONSULTING LLC, to the benefit of Michael POLIAK;

c.    SUBJECT ACCOUNT 3:  First Republic Bank account 80009535032, held in the name of "353 S Wetherly Dr. LLC" to the benefit Michael POLIAK and his contractor, Jacob Lavi.

- 5 -

II.  **STATEMENT OF PROBABLE CAUSE**

    a.  **USPV Owner Michael POLIAK is a Professional Criminal**

    8.  In meeting with a confidential source ("CS-1")[1] and as corroborated by the investigation, POLIAK is engaged in extensive criminal activities.  The following examples demonstrate this:

       i.  <u>POLIAK studied how to commit deceptive online marketing</u>

      a.  During a December 2019 meeting with CS-1, which was recorded and reviewed by investigators, POLIAK described a possible new business deal, which involved fraud: "I have a guy that's a master at driving traffic on-line.  . . . But he does deceptive marketing.  He'll fake some shit, like he'll put Dr. Oz promoting his product or Ellen [DeGeneres] or some shit like

---

[1] During the course of this investigation, agents obtained information and operational assistance from an undisclosed Confidential Source ("CS-1").  I have been the source handler of CS-1 since 2008 when I recruited him to provided information to provide operational support, information and expertise regarding criminal investments, monetary practices, accounting and money laundering.  CS-1's information has led to the seizure of assets, including $200,000 in a mortgage fraud case.  CS-1's information has been corroborated by independent sources such as law enforcement database checks, review of other records, recordings, surveillance, interviews and other investigative activity.  CS-1's information has never been found to be false or misleading.  CS-1 has no criminal history.  I believe CS-1's information is highly credible.

that.  And he'll sell the fuck out of it, but you burn a lot of merchant accounts. . . .  But merchant accounts is the problem.  It's – you burn a lot of them.  You constantly need a flow of merchant accounts.  Cause the [credit card] charge-backs are gonna be like crazy."  POLIAK advised that he had a business meeting arranged with this person for the following day, in order to learn how to take over his business, before he goes to jail[2].  In January 2020, POLIAK introduced CS-1 to Allen NEYMAN, and they discussed possible business deals.  That meeting was recorded and reviewed by investigators.

      ii.     POLIAK's Paycheck Protection Program scheme

      b.    On or about September 15, 2020 CS-1 met with POLIAK.  The meeting was consensually recorded and reviewed by investigators.  During the meeting, POLIAK described obtaining almost $70,000 from Payroll Protection Plan (PPP) for his "employment" at MPG Management.   POLIAK admitted to CS-1 that he only made $1,000 a month, and didn't have any employees, but submitted an application and received $68,700. When CS-1 asked how he did it, POLIAK replied "Cause I filed. That I had hardships."  Additionally, POLIAK applied for and received three SBA (Small Business Administration) loans for his other businesses, though he acknowledged they were loans.  POLIAK described them as "free money," and at an interest rate of 3.75%, could earn more than that through one of his

---

[2] The person running the fraud scheme as described by POLIAK is ALLAN NEYMAN who was involved with the torture/kidnapping discussed above.

"investments."  Throughout this conversation, POLIAK bragged to
CS-1 about committing fraud.

        iii.    POLIAK's marijuana trafficking

        c.    On or about January 27, 2020 CS-1 met with
POLIAK.  The meeting was consensually recorded and reviewed by
investigators.  During the meeting, POLIAK spoke to Memory Buss
using the speaker function on his cell phone.  CS-1 witnessed
both sides of the conversation.  Based on my review of the
conversation, as well as information provided by the California
Department of Consumer Affairs ("CDCA"), Buss is licensed under
CalCannabis for Provisional Adult Use – Nursery; Processor; and
Specialty Indoor – but not retail or manufacturing.  Further,
POLIAK leases property in Los Angeles which he subleases to Buss
for use in her Cannabis business.

        d.    Buss recently ended a partnership in her Cannabis
business because her partners were operating outside the law.
She told POLIAK, "I'm staying compliant by getting rid of them.
I would have lost my license if they would have stayed because
they broke the law so many times."

        e.    During the conversation, POLIAK offered to sell
Buss filling machines for $5,000 each.  He first denied having
any, "I just got rid of everything when I closed out.  They
weren't legal anyway."  But then he said, "I have three laying
around," which she asked to buy.  Based on information provided
by CDCA, "filling machines" are outside the scope of Buss's

license; POLIAK is not licensed to possess these machines at all.

　　　　　f.　POLIAK also offered to broker the sale of 20,000 pre-rolled joints.  While POLIAK was adamant that he did not want to "hold" more than a few samples –"you can drop off samples.  But I don't need to store fuckin' tons of shit.  A couple samples, yeah, no problem.  I'll just hand it over to the guy."  As the conversation is wrapping up, POLIAK tells Buss to bring the samples and he'll give them to a couple of guys.

　　　　　g.　This demonstrates POLIAK's on-going business dealings in the marijuana industry which are outside California law, as he is not licensed.

　　　　iv.　<u>USPV Owner POLIAK bragged about his drug cartel connections</u>

　　9.　In December 2019, POLIAK discussed with CS-1 his various business deals, including one involving the import of produce from Mexico.  During that conversation, which was recorded and reviewed by investigators, POLIAK told CS-1 that he was affiliated with the Beltran-Leyva drug cartel.  During a conversation, CS-1 said, "These guys [referring to CS-1's phone], their mother is from cartel."  POLIAK responded, "That's how I am. I'm Beltran.  Beltran are my people.  Google Beltran, you'll see how big they are.  Guadalajara." POLIAK then told CS-1 that the cartels control everything in Mexico and you can't work there without them.  POLIAK's self-proclaimed association with a well-known Mexican drug cartel suggests his participation in money laundering or drug trafficking.  While POLIAK refers to

the subject of this business as involving "produce" or
"avocadoes," based on my training and experience, produce is
often used by Mexican drug cartels as a "cover" load to disguise
transport of drugs or currency.

10.  During the course of this investigation, agents have
obtained and reviewed financial records related to USPV
principals, including records related to Michael G. POLIAK and
numerous business entities associated with him (e.g. MGP
Consulting, MGP Management).  A review of financial records
associated with MGP Consulting revealed a January 25, 2019 check
for $125,000 payable to AA Consulting Group, Inc.  Public
records show that AA Consulting Group, Inc. belongs to Aram
Abgaryan, who was arrested and charged with murder in October
2019.  Those charges stem from Abgaryan's involvement in an
explosion at a sophisticated cannabis extraction plant in
Chatsworth, California, which resulted in the death of one of
the participants[3]. That POLIAK was participating in this illegal

---

[3] See www.nbclosangeles.com\news, "Five Men Charged For Deadly
Honey Oil Lab Explosion in Chatsworth," October 31, 2019.

"Five men have been charged with murder following a deadly
explosion at an illegal honey oil lab in September that killed a
man they were working with, authorities announced Thursday.

The defendants and the victim had been operating a lab in
Chatsworth, where they extracted THC, the high-inducing chemical
found in marijuana, from cannabis plants for at least two months,
the Los Angeles district attorney's office said in a statement.

The lab exploded Sept. 21 while four of the men and the victim,

and dangerous enterprise is supported not only by the check he
wrote to AA Consulting, but by statements he made to CS-1 in
December 2019.  In a conversation between POLIAK and CS-1, which
was recorded and reviewed by investigators, POLIAK described an
"unlucky" guy who used to "make oil" for him using solvents.
According to POLIAK, the man had a heart attack prior to the
chemical explosion, but the others were being charged with
murder anyway because the death occurred during the commission
of a crime.

        v.    <u>POLIAK's Money Laundering</u>

    11.  In multiple conversations with CS-1, which were
consensually recorded and reviewed by investigators, POLIAK

---

Dados Aroutiounov, 62, were inside. Aroutiounov's remains, burned
beyond recognition, were found the following day under a pile of
debris after investigators received information that someone may
have been killed in the fire.

The cannabis allegedly was being turned into a potent concentrate
known as hash oil or honey oil that can be used in vape pens,
edibles, waxes and other products.

A rise in vaping illnesses nationwide has caused federal
investigators to probe the black market for THC products,
especially illegal vaping cartridges.

Aram Abgaryan, 30, Vadim Klebanov, 59, Arsen Terejyan, 43, Rafael
Mailyan, 32, and Stepan Mailyan, 65, were arrested Tuesday and
charged with murder and manufacturing a controlled substance,
concentrated cannabis. Authorities also seized $3.2 million and
gold bars Tuesday from a storage unit connected to the case.

Each faces 23 years to life in prison. They remain in jail on $2
million bail."

admits to laundering money, often referring to money as "clean" or "dirty," and speaking plainly about the need to "clean my money." The following provide specific examples from conversations between CS-1 and POLIAK:

  a. During a meeting in December 2019, POLIAK told CS-1 that he has monthly income in the form of a $50,000 check. "I get checks for fifty-thousand a month. Forty-five gets me fifty." Later in the conversation, CS-1 asked, "But how do you have fifty a month?" POLIAK replied, "I'm telling you, between like all my things I'll make like six hundred this year." CS-1 asked, "You give them cash, they give you check, is that what—" POLIAK replied, "***No, no that's just to clean my money*** . . . ***that I don't even count as income.***"

  vi. <u>USPV Owner POLIAK admits he uses a shell business to launder money</u>

12. POLIAK further discussed both the "forty-five-for-fifty" deal, and other aspects of money laundering with CS-1 on or about January 27, 2020, during a meeting which was recorded and reviewed by investigators. After a detailed description of his involvement in the cannabis industry, POLIAK said, "I took home 200-something thousand in key money and ten thousand a month income every month." CS-1 asked, "So how do you manage, where do you put your money?" POLIK exclaimed, "I own a vault!" CS-1 asked, "I'm not talking about the cash." POLIAK replied, "It's all cash! It's all cash. Why do you think I bought the vault?" POLIAK then described some of his shell corporations: "I have MGP. ***Because I have to clean the money***. Put money into

MGP so I can pay half the rents.  Half the rent is in cash and
half the rent is clean."

13.  Later in the same conversation with CS-1, POLIAK said,
"I wash $50,000 through my consulting.  Remember, I pay 45 for
50?"  POLIAK continued, "So fifty thousand--" CS-1 finished,
"you put into MGP."  POLIAK corrected, "No, I put into MGP
Consulting.  MGP Consulting pays MGP Management for rent.
Talking about $10,000 a month.  And that goes to the landlords."
CS-1 said, "So you're paying the landlords--" POLIAK finished,
"--through my consulting." CS-1 said, "So you're getting paid
cash . . . you give some fucker cash--" POLIAK finished, "He
cuts me a check.  Fifty thousand for forty-five cash."  It is
important to note POLIAK's use of various shell corporations
such as MGP Management and MGP Consulting.  Based on my training
and experience investigating money laundering organizations, I
know that it is common for criminals to create multiple "shell"
corporations to "layer" criminal proceeds, thereby obscuring
their criminal origins.  Additionally, in this exchange, POLIAK
again openly admits cleaning his money, something which does not
need to be done with lawfully earned income.

14.  A review of Michael POLIAK's bank accounts
(specifically MGP Consulting) corroborates his description of
this activity.  Between February 15, 2018 and January 2020, MGP
Consulting received $50,000 a month (forty-two $25,000 checks)
from Corporation A and Corporation B, both owned by the same
individual.  I learned through conversations with FBI agents
that the individual is the target subject of a current FBI

- 13 -

Healthcare Fraud investigation (hereafter TS HCF)[4].  TS HCF's
signature is on checks from both companies.  Based on
conversations I've had with agents who investigate healthcare
fraud, I know that those engaged in healthcare fraud schemes
often need cash and will pay a premium for it (e.g. $50,000 for
$45,000 in cash) because they need to make cash payments to
"patients" seeking healthcare services which are being over-
billed.  They cannot withdraw the amount of cash they need
without bringing attention to their scheme.  This leads them to
look for other sources of cash.

15.  POLIAK has a large amount of cash which he stores at
USPV.  On or about December 17, 2019, CS-1 met with Michael
POLIAK.  The meeting was consensually recorded and subsequently
reviewed by investigators.  During the meeting POLIAK told CS-1
that as a customer of USPV (prior to buying in to the business),
POLIAK had four boxes at USPV.  He further stated that he now
has "six boxes in the place myself!  I was a customer.  I'm
telling you, I have six ten-by-tens myself."   POLIAK added,
"Let me put it this way, the reason also why I wanted to buy it
[USPV], I got a lot of fucking money now."  Earlier in the
conversation, POLIAK said, "I wish I had fifty [million] right
now.  That would be nice."  CS-1 replied, "Yeah?  In your
twenties or what?"  POLIAK said, "No, not even, bro.  Like ten.

_____

[4] FBI agents who are investigating TS HCF asked that the identity
of the target of their investigation, as well as his/her related
business entities, remain undisclosed in order to protect the
integrity of their investigation.

. . . I have like **two clean, eight like dirty**.  I put most of
it in the house."  Based on my review of the recording and a
debrief of CS-1, I believe that POLIAK has $10 million: $2
million which he laundered through the purchase of property
(discussed below) and $8 million in cash stored in six 10 x 10
boxes at USPV.  Additionally, POLIAK himself describes the $8
million as "dirty," by which I believe he means it was not
legally derived and in the form of cash – not laundered to
appear legitimately earned.

16.  Based on my training and experience, my review of bank
records and recordings, I believe that the cash POLIAK is
sending to TS-HCF is the proceeds of his self-professed "illegal
businesses," likely drug trafficking, which he stores at USPV.
Thus, drug trafficking proceeds are being used to further
healthcare fraud; and the fraud proceeds are being further
laundered by POLIAK to make purchases (such as USPV) and advance
his other criminal interests.

17.  Michael POLIAK described efforts to launder his money
through a real estate purchase to CS-1.  On or about December
17, 2019 and again on September 15, 2020, Michael POLIAK met
with CS-1.  The meetings were consensually recorded and reviewed
by investigators.  During those meetings, POLIAK described to
CS-1 his plans to launder cash through the purchase, renovation
and sale of property located at 3546 Crownridge Drive, Sherman
Oaks, California ("Crownridge Property").

18.  During the earlier conversation, POLIAK told CS-1 that
the property was listed at $2 million, but he offered the

- 15 -

sellers $1.7 million "tomorrow – no inspection."  POLIAK said, "I literally did one day close. Can you imagine?  One day close?"  In the subsequent meeting, POLIAK further explained that he put $600,000 down and took out a mortgage of about $1.2 million[5].  He also told CS-1 that he spent about $1.5 million renovating the property.

19.  In September 2020, with renovations complete, POLIAK told CS-1 he was listing the property for $3.6 million, but expected a bidding war.  POLIAK believed the property was worth closer to $4 million.

20.  With regard to the property purchase and massive renovation under way when CS-1 first saw the property in December 2019, CS-1 commented, "You could, basically what you could do is, one-point-seven, you could easily clean your money through it."  POLIAK replied, "That's what I'm doing with the construction.  Why do you think I'm doing half a million construction?"  CS-1 said, "Half a million cash."  POLIAK said, "I want to do one or two projects like this a year."  CS-1 said, "That's a million dollar give-away.  And you-" POLIAK interrupted, "Ten-thirty-one-exchange[6]." POLIAK added, "And I can wash it off the construction company.  On top of the ten-thirty-one exchange."  CS-1 asked, "You're giving him cash?" POLIAK

---

[5] This is supported by financial analysis which revealed a mortgage on this property.

[6] A 1031 Exchange refers to section 1031 of the IRS Code which allows a real estate investor to avoid capital gains taxes as long as the profit is used to purchase another "like kind property."

said, "I write off Jacob," referring to his contractor, Jacob
Lavi who is also a beneficiary of SUBJECT ACCOUNT 3.  CS-1 said,
"Yeah, you take his check.  You give him cash."  POLIAK said,
"Yep.  . . . We do profit sharing . . . Yeah, on the house.
It's gonna be like this and it comes back clean . . . I pay all
his subs in cash. I've been paying all his subs in cash all year
already."

21.  It is worth noting that POLIAK himself uses phrases
such as "I can **wash** it" and "it comes back **clean**," showing his
own awareness and acknowledgement of money laundering.
Additionally, when CS-1 says "you could easily **clean** your money
through it," POLIAK eagerly agrees, saying "That's what I'm
doing with the construction.  Why do you think I'm doing half a
million construction?"  Finally, by admitting that he is paying
sub-contractors ("subs") in cash and has been doing so all year,
POLIAK is specifically describing how he uses (illegal) cash to
increase the value of his property which he will later sell for
a profit and claim as legitimate income, thus "cleaning" his
"dirty" money.

22.  Finally, during their September 2020 meeting, which
was recorded and reviewed, CS-1 inquired whether POLIAK's asking
price would be reduced if a buyer came in with a million or two
million in cash.  POLIAK told CS-1 he would require "a premium"
if someone came in with cash – he would charge $4.2 million.  "I
don't— Nobody needs cash. . . . I have a ton of cash. . . .
I'm doing business to get rid of my cash."  This further
demonstrates POLIAK's on-going efforts to laundering money

through his various projects.  As described below, POLIAK later
sold the Crownridge Property.  SUBJECT ACCOUNT 1 received a
$2,091,171 of the sale proceeds, and then transferred $1,500,000
of them to SUBJECT ACCOUNT 3.

        b.    USPV Owner Michael POLIAK Used Criminal Proceeds to
           Buy His Interest in USPV

23.  In April 2019, Michael POLIAK purchased a 50%
ownership in USPV.  POLIAK described the deal to CS-1 in a
consensually recorded conversation which investigators reviewed.
During that conversation, CS-1 asked, "How did you meet him
[PAUL], turn around and become a partner? . . . Did you have to
pay him?"  POLIAK replied, "Yeah, I gave him $475,000.  . . .
two-seventy-five clean.  Two hundred dirty."  Later in the
conversation, POLIAK explained, "Mark [PAUL] owned 75%.  Hillary
[BARTH] and her husband [STEVE BARTH] owned 25%.  I bought
twenty-five from Mark, and I bought twenty-five from them.  I
said, 'Mark, I can't buy the place unless I get at least 50%.'"

24.  A review of bank records supports POLIAK's claim.  On
April 2, 2019, $225,000 was deposited into USPV's JP Morgan
Chase bank account ending in #7511.  The deposit included a
Wells Fargo Bank cashier's check in the amount of $125,000,
payable to U.S. Private Vaults, purchased by Michael POLIAK from
SUBJECT ACCOUNT 1; and a check issued from Michael POLIAK's
SUBJECT ACCOUNT 2, for $100,000, payable to U.S. Private Vaults.
Based on POLIAK's statements, agents believe that the remainder
of the $475,000 was paid in cash.  Agents also believe STEVE
BARTH and HILLARY BARTH were paid in cash.

- 18 -

25.   As set forth above, there are numerous factors which indicate that all of POLIAK's income is derived from illegal sources.  The cash in particular cannot be sourced to any lawful pursuit.  However, close examination of POLIAK's bank records reveal the following:

a.   The check for $100,000 from SUBJECT ACCOUNT 2, can be traced to healthcare fraud, as described above.  Between February 15, 2019 and April 1, 2019, POLIAK received three checks from Corporation A, and one from Corporation B., each for $25,000, payable to SUBJECT ACCOUNT 2. These checks are part of the "forty-five-for-fifty" healthcare fraud/money laundering scheme POLIAK himself described.  These deposits funded the $100,000 check from MGP Consulting to U.S. Private Vaults.

b.   In addition, the $125,000 cashier's check SUBJECT ACCOUNT 1 can be traced to a $300,000 E-deposit made in New York on 10/20/2018.  Financial investigators traced this check to Alta Quality Growers, LLC of Elgin, Illinois, whose principal is John Fasano of Brooklyn, NY.  Fasano has a criminal history which involves drug trafficking (marijuana and ecstasy), as well as a financial history which includes a pattern of structured deposits and withdrawals and large wires to Mexico, with no business purpose.  Additionally, Alta Quality Growers, LLC has no website and little internet presence.  It's notable that the company, supposedly located in Illinois, has a (956) area code phone number

– 956 covers much of the Texas-Mexico border.  Based on my training and experience in both drug and money laundering investigations, I believe that Alta Quality Growers, LLC is a drug/money laundering front.  The money therefore which funded POLIAK's WFB account and was used in part to purchase USPV, is likely also criminal proceeds.

C. FINANCIAL TRACING OF TAINTED FUNDS TO THE SUBJECT ACCOUNTS

i.    SUBJECT ACCOUNT 1

26.  On April 19, 2021, I reviewed financial records from Wells Fargo Bank and I spoke with DEA financial investigators. From this review I learned the following:

a.   On June 4, 2018, SUBJECT ACCOUNT 1 received a cashier's check for $57,000 from an account associated with a marijuana collective.

b.   On October 22, 2018, SUBJECT ACCOUNT 1 received a $300,000 check from Alta Quality Growers, a marijuana company.

c.   On January 15, 2019, SUBJECT ACCOUNT 1 received a $30,000 check from an account associated with a marijuana collective.

d.   On April 2, 2019, tainted funds from SUBJECT ACCOUNT 1 was used to purchase a $125,000 check to purchase U.S. Private Vaults.

e.   On October 30, 2019, $200,000 in tainted funds from SUJBECT ACCOUNT 1 was wired to Escrow Company 1 to fund the purchase the Crownridge Property.

- 20 -

f.   On or about March 5, 2021, SUBJECT ACCOUNT 1 received a $2,091,171 wire from an Escrow Company 2, a Sherman Oaks, CA headquartered property settlement company, with the reference "Crownridge Proceeds CWC-KD-241."



**DIAGRAM FOR SUBJECT ACCOUNT 1**

ii.   SUBJECT ACCOUNT 2

27.   On April 19, 2021, I reviewed financial records from Wells Fargo Bank and I spoke with DEA financial investigators. From this review I learned the following:

a.   Between February 20, 2018 and April 6, 2020, SUBJECT ACCOUNT 2 received 28 checks totaling $700,000 from "Medical Reimbursement Consultants."  I believe these payments are part of the health care money laundering scheme that is described in Paragraph 14 of this affidavit.

b.   Between May 17, 2018 and April 21, 2020, SUBJECT ACCOUNT 2 received 20 checks totaling $500,000 from "Marketing 4

You." I also believe these payments are part of the health care money laundering scheme that is described in Paragraph 14 of this affidavit.

      c.    On June 25, 2020, SUBJECT ACCOUNT 2 received $20,833 with the description as "Kabbage SBA loan." In my quick online search, I learned that Kabbage is an online company that among other things, helps facilitate the Payment Protection Program loans. As POLIAK explains in Paragraph 8b of this affidavit, he has engaged in fraud related to these pandemic relief programs.

      d.    On June 30, 2020, SUBJECT ACCOUNT 2 received $149,900 from the US Treasury. I believe these funds are from the Economic Injury Disaster Loan. As POLIAK explains in Paragraph 8b of this affidavit, he has engaged in fraud related to these pandemic relief programs.

     iii.     <u>SUBJECT ACCOUNT 3</u>

    28.  On April 19, 2021, I reviewed financial records from Wells Fargo Bank, I also spoke with investigators from First Republic Bank. From this review and conversation, I learned that:

      a.    On or about March 5, 2021, SUBJECT ACCOUNT 1 received a $2,091,171 wire from an Escrow Company 2, a Sherman Oaks, CA headquartered property settlement company, with the reference "Crownridge Proceeds CWC-KD-241."

b.    On March 25, 2021, funds from SUBJECT ACCOUNT 1 was used to purchase a $1,500,000 cashier's check.  The check was then deposited to SUBJECT ACCOUNT 3.

## III. <u>CONCLUSION</u>

29.  Based on the facts recounted above, there is probable cause to believe that the SUBJECT ACCOUNTS constitute and are derived from proceeds traceable to fraud and the distribution of controlled substances, and were involved in and facilitated money laundering, and are therefore subject to seizure pursuant to 21 U.S.C. §§ 853(f), 881, 18 U.S.C. §§ 981 and 984, and 28 U.S.C. § 2461(c).

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this _____ day of April 2021.


_____
UNITED STATES MAGISTRATE JUDGE

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>  California Corporate<br>  Number C3405297,<br><br>          Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy to Launder Money; 21 U.S.C. § 846: Conspiracy to Distribute Controlled Substances; 18 U.S.C. 371: Conspiracy to Structure Transactions; 18 U.S.C. § 982(a)(1), 21 U.S.C. §§ 853 and 881(a)(6), 28 U.S.C. § 2461(c) and 31 U.S.C. § 5317(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS

1.   At times relevant to this Indictment:

a.   Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

b.   Co-conspirator USPV Officer was an officer of USPV and

one of its owners.  USPV Officer dealt in marijuana, in violation of the laws of California, as well as cocaine.

c.  Co-conspirator USPV Manager was the manager of USPV. USPV Manager helped USPV Officer arrange drug deals within USPV, and helped USPV customers avoid detection by law enforcement, including by advising them to structure their cash purchases to avoid reporting requirements.

d.  Co-conspirator Gold Business was a dealer in precious metals and jewelry, and shared the same space as USPV, as well as some employees.  Gold Business helped USPV customers convert their cash into gold, and structured their cash transactions to avoid federal reporting requirements.

e.  Co-conspirator USPV Representative One was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative One instructed USPV customers how to structure transactions to avoid federal reporting requirements.

f.  Co-conspirator USPV Representative Two was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative Two instructed USPV customers how to structure transactions to avoid federal reporting requirements.

B.  THE OBJECTS OF THE CONSPIRACY

2.  Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant USPV conspired with others known and unknown to the Grand Jury to launder money, in violation of Title 18, United States Code, Section 1956, namely:

a.  to knowingly conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity,

that is, the distribution of controlled substances, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c.   to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

C.   <u>MANNER AND MEANS OF THE CONSPIRACY</u>

3.   The objects of the conspiracy were carried out and were to be carried out, in substance, as follows:

a.   Defendant USPV would adopt business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking, and not law-abiding persons.  Such practices included: (1) touting the anonymity of the safety deposit rentals that defendant USPV would provide, including by advertising "we don't even want to know your name"; (2) boasting that, unlike banks, its anonymous safety deposit box rentals did not require customer information that "can be easily accessed by government agencies (such as the IRS)"; (3) making arrangements for the payment

of the rental fees in cash and other ways that would be untraceable; (4) issuing safety deposit box keys that were unmarked and unnumbered so that law enforcement could not determine that the keys unlocked safety deposit boxes at USPV; and (5) charging safety deposit box rental rates several times higher than those at banks.

b. USPV Officer would capitalize defendant USPV with the proceeds of his illegal drug trafficking.

c. USPV Officer would invite other drug traffickers who knew and trusted him because of his illegal drug trafficking to store the proceeds of their drug trafficking at defendant USPV.

d. Employees of defendant USPV would conduct counter surveillance of the neighborhood and warn customers when they observed law enforcement.

e. Agents of defendant USPV would instruct customers to structure transactions to avoid currency transaction reports including by purchasing gold and other precious metals through Gold Business, which would structure transactions and not file required currency reports.

f. If agents of defendant USPV learned that law enforcement was interested in searching or seizing the contents of a particular customer's safety deposit box, they would attempt to warn the customer, delay law enforcement, or even remove all but a nominal amount of cash from the box for the customer, to prevent law enforcement from discovering and seizing the bulk of the cash.

g. Defendant USPV would deposit the cash proceeds it received from its customers for safety deposit box rentals, which included proceeds from the distribution of controlled substances, into its bank account, and then use those proceeds to maintain USPV's

anonymous storage facilities for its criminal customers.

        h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

        i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    <u>OBJECTS OF THE CONSPIRACY</u>

5.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.    <u>MANNER AND MEANS OF THE CONSPIRACY</u>

6.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    <u>OVERT ACTS</u>

7.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

<u>Overt Act No. 1</u>:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

defendant USPV could provide in bulk.

Overt Act No. 2: On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.    The Grand Jury realleges paragraph 1 of this Indictment here.

A.    OBJECTS OF THE CONSPIRACY

9.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.    MANNER AND MEANS OF THE CONSPIRACY

10.    The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.    OVERT ACTS

11.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.    Defendant USPV shall forfeit to the United States the following property:

a.    All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

b.    A sum of money equal to the total value of the property described in subparagraph a above.

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.    The business computers;

b.    The money counters;

c.    The nests of safety deposit boxes and keys;

d.    The digital and video surveillance and security equipment; and

e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

13

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners.

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a.   The business computers;

b.   The money counters;

c.   The nests of safety deposit boxes and keys;

d.   The digital and video surveillance and security equipment; and

e.   The biometric scanners

4.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c),
defendant USPV shall forfeit substitute property, up to the value of
the property described in paragraph 2 above if, as the result of any
act or omission of defendant USPV, the property described in
paragraph 2 above or any portion thereof (a) cannot be located upon
the exercise of due diligence; (b) has been transferred, sold to, or
deposited with a third party; (c) has been placed beyond the
jurisdiction of the court; (d) has been substantially diminished in
value; or (e) has been commingled with other property that cannot be
divided without difficulty.

A TRUE BILL

/S/

Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section